IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Susan Lesniak | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case 13 CV 4694 |
| | ) |
| Bank of America, N.A., *et al.*, | ) |
| | ) |
| Defendants. | ) |

<u>MEMORANDUM OPINION AND ORDER</u>

In this action, plaintiff asserts that "Bank of America has systematically engaged in unfair, deceptive and illegal acts and practices in connection with its servicing of residential mortgages" and seeks to hold it, along with various other financial institutions, liable for breach of contract, or, in the alternative, for equitable relief on the theory of promissory estoppel; common law fraudulent misrepresentation and concealment; violation of the Illinois Consumer Fraud ("ICFA") and Deceptive Business Practices Act and the Real Estate Settlement Procedures Act ("RESPA"); and "Damages Arising from Administration of Second Mortgage and to Enjoin Foreclosure." Plaintiff also seeks a "Declaratory Judgment for an Accounting and Declaration of Ownership and Servicing Rights" with respect to her mortgage.

Before me are two motions to dismiss the complaint in its entirety, one brought by defendants Bank of America, Wells Fargo, U.S. Bank, and Mortgage Electronic Registration Systems ("MERS"), and the other by defendants GS Mortgage Securities Corp., Goldman Sachs Mortgage Company, and Nationstar Mortgage LLC.[1] I grant the first of these motions for the following reasons and deny the second as moot.

I.

Although plaintiff's complaint is lengthy, her two-pronged theory of defendants' wrongdoing is straightforward. The gist of the first prong is that Bank of America failed to offer her a permanent HAMP modification of her home loan, despite its promise to do so upon her execution and compliance with a Trial Period Plan ("TPP") agreement, and despite her execution and compliance with several such agreements. The second prong asserts that defendants failed to respond adequately to her Qualified Written Requests seeking information about who owned and serviced her loan. I summarize plaintiff's allegations below.

In October of 2005, plaintiff borrowed $420,000 from defendant Palos Bank & Trust Company, as evidenced by a Note naming Palos Bank as Lender, which was secured by a mortgage

---

[1] References to "defendants" in this decision refer to the first group of defendants unless otherwise noted.

naming defendant MERS, as nominee for the Lender, as Mortgagee.[2] Plaintiff alleges that the Note and Mortgage were transferred multiple times thereafter, and that the loan has been serviced by Countrywide Home Loans Servicing LP, BAC Home Loans Servicing LP, and Bank of America N.A., successively, on behalf of the instruments' various owners.

In 2009, plaintiff began to experience financial distress, and Bank of America informed her, in September of that year, that it intended to accelerate her loan. Shortly thereafter, plaintiff began what would become a lengthy, frustrating, and ultimately disappointing process of seeking a loan modification from Bank of America. Plaintiff alleges that over the next several years, Bank of America verbally offered her several Trial Period Plan ("TPP") agreements, and that on "at least two occasions," she executed a TPP agreement. Am. Cmplt. at ¶¶ 31, 46. Although she does not allege when these various offers were made, when she executed the agreements, or what their terms were, she states that around January of 2010, Bank of America assured her orally that "payments were being made pursuant to a Trial Payment Plan," and that "she was to make $1,977.19 trial payments after which she would receive a 2% rate fixed for 5 years." *Id.* at ¶ 49. Plaintiff began

---

[2] Plaintiff's then-partner co-borrowed the loan, but plaintiff became the sole borrower after the two separated. Because neither party argues that these facts are material here, for simplicity I refer to plaintiff alone as the borrower.

3

making trial payments, but Bank of America again informed her, on March 23, 2010, that it intended to accelerate the First Mortgage.

Plaintiff continued to make trial payments and to provide documentation to Bank of America, but in December of 2010, Bank of America "verbally denied [plaintiff] a modification under HAMP but told [plaintiff] that they were preparing a modification for investor and management approval." Am Cmplt. at ¶ 53. On March 7, 2011, a Bank of America representative confirmed that plaintiff did not qualify for a HAMP modification. *Id*. at ¶ 58. Then, in April of 2011, plaintiff received a formal notice that her loan modification request had been denied. *Id*. at ¶ 59. Nevertheless, plaintiff's file was placed in "suspense" for further review. *Id*. at ¶ 61.

After the denial of her request for a HAMP modification, plaintiff continued to make payments under a TPP, and she continued to communicate with Bank of America about her case. Although her file was apparently still under review, plaintiff received another "Notice of Intent to Accelerate" on or around August of 2011. Shortly thereafter, two separate Bank of America representatives told plaintiff that she had been approved for a loan modification and would be receiving a package to effectuate it, but she did not receive a modification at that time. *Id*. at ¶ 69. Meanwhile, Bank of America continued to request additional information in support of her modification request, which

plaintiff provided throughout the remainder of 2011. Her request for modification was again denied in April of 2012 on the ground of "excessive forebearance" (sic). Am. Cmplt. at ¶ 74.

Still, negotiations continued. Finally, on or about October 3, 2012, a Bank of America representative verbally advised plaintiff that a trial modification had been approved. *Id*. at ¶ 85. Plaintiff attaches to her complaint a letter from Bank of America dated September 14, 2012, which states:

> Congratulations. We have determined that you are eligible for a trial modification. Enclosed is your Trial Period Plan. If you successfully complete the trial modification, your permanent modification may be similar in terms/payments, pending final review at the time of the permanent modification. …
>
> After you successfully complete your Trial Period Plan by making three trial payments, we will contact you to discuss the terms of your permanent modification….

Am. Cmplt. Exh. D at 1 (DN 17-5). The enclosed TPP (the "October 2012 TPP") provides that plaintiff must make monthly trial payments of $2,105.08 within thirty days of October 1, November 1, and December 1 of 2012. It then states,

> You will receive a permanent modification of your account if you have a) paid each of the monthly trial period payments (the "Trial Payments") on time, and b) signed and returned the final Modification Agreement, which will be sent once you have completed your Trial Payments.

*Id*. The remainder of the TPP sets forth additional terms and conditions, including that the terms of the final modification

agreement would be determined at the conclusion of the Trial Period. The TPP also advised that plaintiff's credit score may be affected by accepting a TPP or final modification. *Id*. at 3.

In a final section captioned "Loan Modification Agreement Frequently Asked Questions," the TPP states:

> There are several different ways we may modify the terms of your loan to reach an affordable payment. The specific terms of your modification will be set forth in your modification agreement, but the modifications to your existing loan may include one or more of the following:
>
> o Your loan may be brought current by capitalizing past due amounts. This means we may add past due interest, servicing expenses paid to third parties if taxes and insurance have been paid but will not be collected through escrow account and to the extent permitted and taxes and insurance which may have been paid on your behalf to your principal. Any unpaid late fees arising from your most recent delinquency will be waived at the time of modification.
>
> o Your loan payments may be recalculated over a longer period even though the maturity date of your loan will not change. This will help lower your monthly payments, however, it will result in your loan having a lump sum payment (known as a balloon payment) which will continue to accrue interest until you pay off the modified loan (unless you choose to pay that amount sooner).
>
> o You may be offered an interest rate that is equal to or lower than your current interest rate. If your new modified interest rate is below market rate, it may increase annually until it reaches the market rate on the day your modification becomes effective….
>
> Your permanent modification agreement may not contain all of these terms, or may contain different terms. The key terms of your permanent modification agreement will be designed to provide you with affordable monthly mortgage payments.

*Id*.

Plaintiff complied with her obligations under the October 2012 TPP, and on January 30, 2013, Bank of America presented her with a loan modification whose terms included: a New Principal Balance of $514,841.58, of which $100,000 would be deferred and become payable at the loan's maturity date, which was unchanged; extended amortization of the principal amount over 480 months, resulting in a "balloon payment" of $343,764.88, also due at maturity; and a downward modification of the applicable interest rate to 2% for the first 60 months, 3% for the next 12 months, and 3.5% for the remaining 200 months of the loan. *See* Am. Cmplt., Exh. E. Plaintiff alleges that the proposed modification was "not in compliance with the terms of the modification agreement that had been promised to her." Am. Cmplt. at ¶ 95.

Plaintiff also challenges the proposed modification on the basis that "there is no evidence that Bank of America continues to be the 'lender' or has any right to modify the payment terms of the Loan." *Id.* In this connection, plaintiff alleges that she made Qualified Written Requests ("QWRs") to defendants Wells Fargo Bank, U.S. Bank, and Bank of America, "among others." *Id*. at ¶ 24. Plaintiff asserts that she sent QWRs on July 27, 2011 and August 16, 2011, to Bank of America, and on June 1, 2012, to Wells Fargo. *Id*. at ¶ 164. Bank of America did not acknowledge receipt of her QWRs within five days as required by 12 U.S.C. § 2605(e)(1)(A), and

7

its responses to her August 16, 2011 were "incomplete and contradictory."

## II.

A motion to dismiss tests the sufficiency of a complaint, not its merits. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). While Rule 8 does not require detailed factual allegations, a plaintiff must provide defendants with fair notice of the basis for her claims, and she must include sufficient factual information to render her claim legally plausible, as opposed to merely speculative. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Fraud claims, which are governed by Rule 9(b), require additional specificity, which means plaintiffs must plead the "who, what, when, where and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 726 (7th Cir. 1990).

Because parties are bound by their pleadings, a plaintiff can "plead himself out of court by alleging facts which show that he has no claim." *Soo Line R. Co. v. St. Louis Southwestern Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997). While all well-pleaded allegations are generally presumed true, "to the extent that the terms of an attached contract conflict with the allegations of the complaint, the contract controls." *Centers v. Centennial Mortg., Inc.*, 398 F.3d 930 (7th Cir. 2005).

A. Breach of contract and promissory estoppel

Defendants argue that plaintiff's contractual and quasi-contractual claims must be denied for the simple reason that, as plaintiff's allegations and exhibits make plain, Bank of America fully performed its contractual and equitable obligations by offering her the January 2013, non-HAMP loan modification. Defendants emphasize that nothing in either the October 2012 TPP, or any other agreement plaintiff claims to have had with Bank of America, promised her a HAMP modification.[3] I agree.

Plaintiff's assertion that Bank of America promised her a HAMP modification cannot be reconciled with her allegations that Bank of America *denied* her request for a HAMP modification in December of 2010, stating that a (presumably non-HAMP) modification was being prepared "for investor and management

---

[3] While plaintiff states that she executed "at least two" TPP agreements, her breach of contract claim specifically identifies the October 2012 TPP as the relevant agreement. *See* Am. Cmplt., Exh. D at ¶¶ 117, 122. While her alternative, promissory estoppel count refers to TPP "Agreements" (plural), then refers, confusingly, to "the TPP Agreement at Exhibit A" (confusing because the complaint contains no "Exhibit A" but rather Exhibits A-1 and A-2, neither of which is a TPP), other paragraphs in that count suggest that it, too, is premised on the promises contained in the October 2012 TPP. *See, e.g., id*. at ¶ 140 (identifying "verbiage" in the TPP as a basis for her reasonable reliance). Even assuming, however, that one or more of the TPP agreements she claims Bank of America "offered verbally" were the basis for these claims, the complaint says so little about them (such as when—even roughly—the agreements were formed or what their basic terms were), that it does not plausibly suggest an entitlement to relief. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008).

9

approval," then reiterated, in March of 2011, that she was not eligible for a HAMP modification. Am. Cmplt. at ¶ 53, 58. Plaintiff's claim is likewise at odds with the October 2012 TPP itself, which made no mention of HAMP and underscored that the terms of plaintiff's permanent modification would not be determined until the completion of the Trial Period. Neither the oral representations plaintiff attributes to Bank of America, nor the statements it made in the October 2012 TPP, can reasonably be construed as a promise (conditioned on plaintiff's compliance with certain terms) to offer plaintiff a permanent HAMP modification.

Moreover, the October 2012 TPP explicitly advised plaintiff that a permanent modification would be designed to achieve "affordable monthly mortgage payments," and that it could include deferred "balloon payments," capitalization of past due amounts, and lower interest rates, among other terms. Consistent with these representations, the permanent modification plaintiff received in January of 2013 contained all three of these elements and proposed monthly payments similar to her trial payments.

Plaintiff's response to defendants' motion ignores the language of the October 2012 TPP and instead refers to a decision in the HAMP multi-district litigation currently pending in the District of Massachusetts, to which plaintiff is not a party. Plaintiff reproduces several of the court's observations in that case, including that many Americans have felt "vast

frustration…over the mismanagement of the HAMP modification process," and that the plaintiffs there had "plausibly alleged that Bank of America utterly failed to administer its HAMP modifications in a timely or efficient way."  Case No. 1:10-md-02193-RWZ (D. Mass.) (DN 272 at 31), Pl.'s Opp., Exh. A.

Unlike plaintiff, however, the borrowers in the MDL case received TPPs expressly promising HAMP modifications at the end of a successful trial period.  *See Sykes v. Bank of America Corp.*, 2014 WL 4681608 (E.D. Mich. Sept. 19, 2014) (noting that TPPs in the MDL were titled "Home Affordable Modification Trial Period Plan" and promised "a Home Affordable Modification Agreement" upon its successful completion).  Indeed, the MDL concerns only TPPs issued under HAMP Supplemental Directive 09-01. *See* Pl.'s Opp., Exh. A at 31.  Plaintiff does not allege that the October 2012 TPP, or any other TPP she was offered, was issued pursuant to that Supplemental Directive or any other HAMP-related authority.[4]

Finally, plaintiff's insistence that she was, in fact, eligible for a HAMP modification does not support her claims. Because HAMP provides no private right of action, *see Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 559 n. 4 (7th Cir. 2012), Bank of America's alleged failure to evaluate her application

---

[4] Also inapposite is plaintiff's argument that Bank of America "did not deny, in writing, eligibility for a HAMP modification by the Modification Effective Date." Pl.'s Opp. at 2-3.  Neither these allegations, nor indeed the term "Modification Effective Date," appears anywhere in plaintiff's complaint.

11

consistently with HAMP Guidelines is actionable only to the extent that Bank of America's conduct violates some other principle of law or equity. *See Wigod*, 673 F.3d at 585-86 (reversing dismissal of claims alleging noncompliance with HAMP that are "actionable under the laws of [Illinois]"). For the reasons explained above, the conduct plaintiff alleges as the basis for her breach of contract and promissory estoppel claims did neither. *See id.* at 560 (breach of contract claim requires breach) *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 868 (7th Cir. 1999) (promissory estoppel claim requires "clear and definite" promise).

B. <u>Fraudulent misrepresentation/concealment; violation of ICFA</u>

Defendants argue that plaintiff's fraud claims fail for multiple reasons, including substantially the same one as doomed her contract claims: just as Bank of America did not promise anything it failed to deliver, it did not make any statements that turned out to be untrue. I address the primary reason these claims fail below.

Fraudulent representation requires: 1) a false statement of material fact; 2) known or believed to be false by the party making it; 3) intent to induce the other party to act; 4) action by the other party in reliance on the statement's truth; and 5) damage resulting from that reliance. *Wigod*, 673 F.3d at 569.

Plaintiff alleges that Bank of America "intentionally misrepresented to her that if she complied with the TPP, she would

12

get a Modification Agreement which would modify her loan documents and waive all past late charges," and that this statement was false because she did not receive such a modification. Am. Cmplt. at ¶¶ 144, 153. But plaintiff *did* receive an offer for a permanent modification, and plaintiff has not pointed to any representation, in the October 2012 TPP or elsewhere, that "all past late charges" would be waived incident to a permanent modification of her loan. Indeed, the October 2012 TPP contained explicit representations about how late fees would be handled upon permanent modification ("[a]ny unpaid late fees arising from your most recent delinquency will be waived at the time of modification"), which plaintiff does not claim to be inconsistent with the January 2013 permanent modification. For at least these reasons, she has not plausibly alleged fraudulent misrepresentation.[5]

Plaintiff's statutory fraud claim fares no better. The ICFA requires her to establish, among other things, a deceptive or unfair practice. Plaintiff does not adequately plead deception

---

[5] Plaintiff's fraudulent concealment claim does not require independent discussion because it is not materially distinct from her fraudulent misrepresentation claim. The only fact plaintiff claims Bank of America failed to disclose was its intent not to offer or properly consider her for a HAMP modification. *See* Am. Cmplt. at ¶¶ 150-51. But Bank of America did not conceal any such intent. To the contrary, it expressly rejected her request for a HAMP modification, and plaintiff does not raise a plausible claim that it intentionally evaluated her application improperly, much less that it concealed an intent to do so.

13

for reasons previously explained. And while the ICFA contemplates claims based on "unfairness" as distinct from those based on "deception," in this case the two are coextensive. Plaintiff recites the terms "unfair" throughout her complaint, but the only substantive allegations that support this characterization simply refer back to Bank of America's putative misrepresentations and deception.

## C. RESPA

Defendants assert that plaintiff's RESPA claim fails as a matter of law because: 1) plaintiff does not allege actual damages resulting from defendant's failure to identify creditors, and 2) plaintiff's allegations are insufficient to state that her alleged requests for information constituted Qualified Written Requests under RESPA. Plaintiff does not respond to either of these arguments. While I am not persuaded plaintiff's RESPA claim is formally defective under Rule 8 for failing to allege the kinds of details defendants fault her for omitting, I agree that her allegations are substantively deficient because they do not state actual damages resulting from defendants' non-compliance with of RESPA.

Failure to plead actual damages is fatal to a RESPA claim. *Konieczka v. Wachovia Mortg. Corp.*, No. 11 C 71, 2012 WL 1049910 at *4 (N.D. Ill. Mar. 28, 2012) (Kendall, J.). *See also Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 693-94 (7th Cir. 2011).

14

Plaintiff claims that Bank of America and Wells Fargo violated RESPA by failing to respond timely to her QWRs, and by providing incomplete or contradictory information about who ultimately holds the interest in her loan. She does not claim, however, that either of these alleged violations resulted in any actual, pecuniary damages to her. She does not allege, for example, that her mortgage payments were not received by the appropriate entity at any point throughout the loan's alleged transfers, such as might have caused her to incur late fees, penalties, or interest. Cf. *Konieczka*, 2012 WL 1049910 at *2 (overpayment of interest resulting from Bank's failure to correct PIN number on loan documents could amount to actual damages). Nor does she allege that her failure to obtain a HAMP modification from Bank of America, or the damages that resulted therefrom, were related in any way to her inability to ascertain the identity of the Note holder or "investor." For these reasons, her RESPA claim must be dismissed.

D. <u>Declaratory judgment, accounting and injunctive claims (Counts I, VII, and VIII)</u>

Three claims remain for disposition. Although they are analytically distinct, each warrants dismissal on the basis that plaintiff fails to respond to the arguments defendants raise. *See Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1043 (7th Cir. 1999) ("by failing to respond responsively to the motion to

15

dismiss…[plaintiff] forfeited her right to continue litigating her claim.")

III.

For the foregoing reasons, defendants' motion is granted. Because this order disposes of plaintiff's complaint in its entirety, I need not reach the issues raised by other defendants' motion and therefore deny it as moot.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: March 3, 2015